## No. 9219.

### Mr. AND Mrs. JOHN SHEA vs. E. S. REEMS.

Where a person with his horse and wagon is employed by another to perform services for the latter at a fixed wage of so much per week and certain additional commissions, the payment of wages establishes the relation of master and servant, implies subjection of the latter to the control and direction of the former, and gives rise to the responsibility of the master for the servant's negligent injuries in the course of his employment.

Where the servant who is employed to peddle goods for the master in a horse and wagon is driving to the latter's store to get goods, such driving is in the discharge of his duty and in the course of his employment, though he then had none of the master's goods in his wagon ; and injury inflicted by negligent driving is subject to a rule of *respondeat superior*.

The defense of contributory negligence on the part of the injured plaintiff is not sustained by the proof, and the damages allowed is not excessive.

APPEAL from the Civil District Court for the Parish of Orleans. *Monroe*, J.

*E. E. Moise* for Plaintiffs and Appellees.

*Jonas & Nixon* for Defendant and Appellant.

The opinion of the Court was delivered by

FENNER, J.   This is an action for damages for injury to plaintiff, Mrs. Shea, resulting from being knocked down and run over by a horse

and wagon driven by one Rickert, the servant, as is claimed, of defendant, and occasioned, as alleged, by his negligence, without fault on her part.

From a verdict and judgment awarding $1000 damages against defendant he prosecutes the present appeal.

He assigns as grounds of error:

1. That Rickert was not the servant of defendant.

2. That, if such servant, the damage claimed was not done by him while exercising the functions for which he was employed.

3. That Mrs. Shea was guilty of contributory negligence.

4. That, in any event, the damages awarded are excessive.

### I.

The evidence leaves no doubt that Rickert was employed by defendant, Reems, to peddle goods for the latter at a fixed wage of six dollars per week, with an additional compensation of two *per cent* on the price of all goods sold, and with the privilege of keeping any excess of price for which he sold the goods, over and above the prices limited by Reems.

Under the textual provisions of the Code this contract established the relation of master and servant.

Servants, says the Code, are those " who let, hire or engage their services to another in this State, to be employed therein at any work, commerce or occupation for the benefit of him who has contracted with them, for a certain price or retribution, or upon certain conditions." Art. 163.

" There are three kinds of servants, viz.: 1. Those who hire out their services by the day, week, month or year, in consideration of certain wages; 2. Those who engage to serve for a fixed time, etc.; 3. Apprentice, etc." Art. 163.

Rickert clearly belonged to the first class of servants, and Reems bore to him the correlative relation of master.

There seems little need to refer to common law authorities on the subject, but, were we to do so, they would afford defendant no relief. In that system the test of the relation of master and servant is found in the question whether one person has placed himself under the direction and control of another in such manner as to confer upon the latter the power of discharge for disobedience. Cooley on Torts, p. 532; 2d Thompson on Neg. p. 892, and authorities cited.

Our Code ordinarily infers such power of control and discharge from the payment of wages. We find the same rule to prevail at common

law, where, in discussing the distinction between servants and independent contractors, it is thus stated by Mr. Thompson: "Perhaps the most usual test by which to determine whether the person doing the injury was a servant or independent contractor, is to consider whether he was working by the job or at stated wages—so much per day, week or month. A person who works for wages * * * is a servant, and the master must answer for the wrongs done by him in the course of his employment." Thompson on Neg. p. 912, §39.

And, indeed, it would be difficult to imagine one person's binding himself to pay a fixed compensation weekly for the service of another, if the latter were to be emancipated from the former's direction and control and left free to perform the service or not at his whim, or to perform it in a manner opposed to the employer's will, and, perhaps, yielding him no benefit. If the term of employment had been for one year and at a fixed annual compensation, the incongruity of such a construction would be more striking; but the principle is identical.

The attempt to pervert the relation between Reems and Rickert into a mere bailment to sell goods upon commission like the relation between a cotton factor and his shipper, is entirely negatived by the contract for wages, which placed Rickert's time and labor at the exclusive service and control of Reems within the scope of the employment.

The fact that, under the laws of the United States, Rickert, in order to peddle tobacco for himself or anybody else, was compelled to take out a license in his own name does not affect the case. Suppose the Constitution permitted and the law required clerks in mercantile houses to take out a license on their occupation: would that destroy the relation of master and servant between them and their employers?

Nor is the case affected by the fact that Rickert was the owner of the horse and wagon which he was driving. It is not denied that the horse and wagon were essential to the service for which he was employed. In fact, at the date of the employment they belonged to Reems, who sold them to Rickert on credit, and who took them back, after the termination of Rickert's employment, on refunding such part of the price as the latter had paid. The service for which Rickert was employed was to peddle goods for Reems with that horse and wagon; in driving the same in that business he was acting as a servant in the course of his employment, and for injury done by him the rule of *respondeat superior* applies, independent of the ownership of the horse and wagon.

## II.

It is claimed, however, that at the time of the injury Rickert was not exercising the functions for which he was employed. This is based on

the fact that at that moment he had none of Reems' goods in his wagon. But it is clearly proved that he was on his way to Reems' store to get goods. Whether he was going after goods for the first time that morning or returning for more after having sold out those first taken does not clearly appear. But what matters it? Was it not his duty and within the scope of his employment to drive the horse and wagon to the store in order to get goods? The significant fact is, that he was the servant of Reems to peddle goods and to drive a horse and wagon for that purpose. Why was he driving on that day? Obviously in the discharge of his duty as such servant, which bound him to do so. Whether he had Reems' goods in his wagon or was driving to get them, if his driving was in the discharge of the duty of his service, it was, in the eye of the law, the master's driving, and for negligent injury the rule of *respondeat superior* applies.

We never apply this rule without a sense of its hardships on the master; but it has been settled on a broad balancing of reason and equities, and *judicis est dicere, non donare, legem.*

### III.

The charge of contributory negligence is not sustained by the evidence. Mrs. Shea was crossing Annunciation street at the corner of Calliope. She had a sun-bonnet on and was crossing diagonally from the upper side of Calliope to the lower. Hence, not only was her vision obstructed by her bonnet, but her back must have been partially turned towards up-town, the direction from which Rickert, with his wagon, was coming. The street was clear, as far as appears, except for that wagon, which, at the time when she started across, was a considerable distance off. There was no reason for her to anticipate that, in crossing, under such circumstances, the wagon would be driven so rapidly as to reach her, or so carelessly as to run over her. It was, therefore, not contributory negligence on her part not to have continued her lookout on the approaching wagon. Summers vs. Railroad, 34 Ann. 139.

On the other hand, the negligence of the driver was of the grossest character. According to his own account, he saw her and saw that she had on a sun-bonnet. It was broad day and there was ample room for him to have passed on either side of her. He was driving rapidly. He ran over her so carelessly and recklessly that, even after it was done, he was ignorant that the accident happened until called back by bystanders. His own account is a curious one: "On the morning that this *supposed* accident happened I was coming down *leisurely* Annunciation street, and when near the corner of Calliope I saw some woman cross-

ing with a sun-bonnet on. I kind of hollowed at her and she didn't observe me, and she went on. I stopped and then pulled to my right by Walshe's grocery store. I saw *then* that this woman *had been lying down* on the track of the Annunciation cars." This is all he has to say on the subject, so that he seems to have been so negligent as to be ignorant whether the woman was standing up or lying down when he ran over her. The testimony of by-standers convicts him of inexcusable negligence.

### IV.

As to the *quantum* of damages, a fractured thigh, six to eight weeks motionless confinement between sand-bags, with attendant bed-sores and sufferings, a short leg, liability to neuralgic troubles, and other injuries indicated by the medical testimony, seem to us not excessively compensated by a verdict of one thousand dollars.

Judgment affirmed.