DILLON v. NEW ORLEANS PUBLIC SERVICE, Inc.

No. 16349.

Court of Appeal of Louisiana. Orleans.

Nov. 4, 1936.

Ivy G. Kittredge, of New Orleans, for appellant.

Porteous, Johnson & Humphrey and T. W. Bethea, all of New Orleans, for appellee.

McCALEB, Judge.

The plaintiff, Florita Dillon, brought this suit against the New Orleans Public Service, Inc., for the recovery of damages for personal injuries sustained by her while a passenger on one of the defendant's street cars.

The petition alleges, in substance, that on April 9, 1934, plaintiff boarded an Esplan-

ade Belt street car at the corner of Canal and Royal streets in the city of New Orleans; that she paid her fare; that shortly before the street car arrived at the corner of Canal and Dauphine streets, she left her seat and proceeded towards the entrance of the car for the purpose of alighting therefrom; that she reached the front platform and was standing there in position to alight from the car after it came to a stop; that the motorman suddenly and without warning brought the car to a stop with an unusual jolt which had the effect of throwing the plaintiff from the platform to the neutral ground pavement, causing her severe injuries. It is further averred that the injuries received by the plaintiff consisted of a fracture of the right tibia and also a fracture of the right fibula at the junction of the lower middle third, or, in other words, a broken leg.

The answer of the defendant carrier is a general denial, coupled with the averment that on information and belief a passenger named Florita Dillon was injured on April 9, 1934, at about 6:48 o'clock p. m. while one of defendant's Esplanade Belt street cars was being prudently operated on Canal street in the direction of the Lake; that said street car was at a stop, at its regular stopping place at the riverside of Dauphine street, when a stout lady, wearing high heel shoes, attempted to alight from the front end of the car and while in the act of stepping down from the step of the car to the ground, she either tripped, slipped, or turned her ankle and fell to the pavement and claimed to be injured in so doing.

On the foregoing issues, the case was tried before a jury, resulting in a nine to three verdict in favor of the plaintiff for damages in the sum of $3,460. A new trial was applied for but refused by the district judge. A judgment was thereupon entered for the amount of the jury's verdict, and the defendant has appealed to this court.

The primary question here is one of fact, viz.: Did the street car come to a sudden and unusual stop, which had the effect of throwing the plaintiff from the platform as contended for by her, or did the plaintiff slip or twist her leg while stepping from the front end step of the defendant's car after the same had come to a smooth stop as claimed by the defendant?

The rule of law respecting the liability of a carrier for injuries to a passenger, where the passenger has failed to reach his destination in safety, is now well settled. That rule, as set forth in Cusimano v. New Orleans Public Service, 170 La. 95, 127 So. 376, is that the carrier has the burden of showing that it was free from any negligence which might have caused injury to its passenger, but it is not required to show how and why the passenger was injured in order to bar recovery.

The plaintiff has been employed by the Crescent Cigar & Tobacco Company for approximately 16 years. On the date of the accident, she, together with her intimate friend, Miss Sallettes, became a passenger on the Esplanade Belt street car at the corner of Royal and Canal streets. She obtained from the conductor a transfer from this Esplanade Belt car to the St. Charles Belt, as it was her intention to go up town and take a music lesson. She and her friend were seated on the second cross seat on the left-hand side from the front of the street car, the plaintiff occupying the seat nearest the center aisle.

The street car involved is of the older type car which was regularly used by the defendant company up to 15 or 20 years ago on all of its lines. Since then, that type of car has been gradually discarded for a newer type which is equipped with an automatic door, known as a safety door. However, the testimony shows that the discard of the type of car involved in this accident has been gradual, and the defendant company, at the time of the accident, still used the open type of car on the Esplanade Belt line.

It is the practice and custom of the street car company, when these open door cars are being operated on Canal street, to stop the car at the intersection of every important thoroughfare in the business district on Canal street, for the purpose of taking on and discharging passengers, without previous notice being given by passengers, intending to alight, of their desire to depart from the car. It is also the custom of the defendant to fold back the door on the right-hand side of the front vestibule, towards the body of the car, leaving an open space for passengers to depart from the street car and a handhold is provided to assist such passengers in making their exit.

The plaintiff testifies that, in accordance with the custom of the company, when the car arrived in the block between Bourbon and Dauphine streets, she, intending to depart from the car at the corner of

408

Dauphine and Canal streets, got up from her seat, while the car was approximately in the middle of the block between Bourbon and Dauphine streets, and proceeded towards the front end thereof. She relates that when she first got up the semaphore light, directing traffic at the corner of Dauphine and Canal streets, was green; that as she reached the vestibule on the front of the car, the semaphore light had changed to "caution"; that at that time she noticed the motorman talking with two men who were standing on the front end of the car; that the motorman did not slow down the speed of the car, which she fixes at approximately 15 miles per hour, and that she stood on the vestibule with her right hand on the grab-handle to balance her, facing in the direction of Maison Blanche (which is approximately at an oblique 45-degree angle to the right from the direction in which the car was traveling). She says that at that time the semaphore light at the corner of Dauphine street had turned red against traffic proceeding on Canal street; that the motorman suddenly and without warning applied his .brakes; that the car started to stop with a jolt, and that this sudden and unexpected movement of the street car had the effect of throwing her forward slightly towards the right, out of the street car in the direction of the Maison Blanche building. She further testifies that she was thrown to the pavement, landing on her right leg with all of her weight; that her right leg buckled up under her and she knew at that time that her leg was broken. She further says that the motorman dismounted from his post, as well as the conductor; that they attempted to assist her to her feet; that she was unable to walk and called for her friend, Miss Sallettes, who was still in the street car. She relates that she was entirely conscious, but was suffering intense pain, and that just after her friend appeared, a policeman came up and inquired as to what had happened. She then says that a taxicab came up and she was transported by the cab to the Charity Hospital, and that Miss Sallettes accompanied her on the journey.

The plaintiff's testimony, for the most part, is fully corroborated by her friend, Miss Sallettes. This lady testifies that she and the plaintiff have lived together for some time, both being unmarried, and that they are both employed by the same company. The witness says that she and

the plaintiff were seated on the second cross seat on the left side towards the front of the street car; that just after the street car passed D. H. Holmes store, the plaintiff got up and walked to the front platform for the purpose of alighting therefrom; that she saw the plaintiff standing on the platform and just as the street car arrived at the corner of Canal and Dauphine streets, the car made a sudden and abrupt stop which had the effect of throwing certain packages, which the witness had on her lap, upon the seat in front of her, and also resulted in jolting the witness forward so that her chest hit the back of the seat in front of her. The witness says that she did not see the plaintiff fall, but feeling that something had happened to the plaintiff, she picked up her bundles and immediately went to the front platform to see what had occurred. When she got there, the motorman and the conductor were holding the plaintiff, and just about that time, a police officer came up and inquired as to what had taken place. She further says that the officer hailed a taxicab and ordered the driver to take the plaintiff to the Charity Hospital, and that she accompanied the plaintiff on the journey.

The defendant's version of the accident is entirely different from that given by the plaintiff. It maintains that the street car came to a smooth and usual stop; that the plaintiff, in alighting from the front platform, had placed her left foot on the step and that when she placed her right foot on the ground, it evidently slipped or her ankle twisted or something else happened whereby her leg was broken under her weight. It offers to substantiate its theory by the testimony of the motorman and conductor, two alleged passengers standing on the front end of the car, and a police officer who claims to have been a bystander. We shall consider the testimony of these witnesses in the order in which they related their stories to the jury.

Anepohl, the police officer, testified that at the time of the accident, he was standing parallel with the semaphore and the innerside of Dauphine street and the neutral ground; that he saw the plaintiff get off the front end of the street car and that the street car was at a standstill at the time the plaintiff attempted to alight; that he had seen the motorman bring the car to a stop and that there was nothing unusual about the manner in which the brakes were

applied. He says that he saw the plaintiff with her left foot on the step in the act of placing her right foot on the neutral ground; that as she did so, her right foot turned and she went down to a sitting position, with her back toward the neutral ground curb. He says that he was standing between 12 and 15 feet from the plaintiff at the time the accident occurred; that he and the motorman immediately went to her assistance and that he later hailed a taxicab and had plaintiff taken to the Charity Hospital.

The next defense witness was one Roman Dours, who testified that he was present at the scene of the accident, being a passenger on the street car, standing on the front end thereof on the right-hand side of the motorman. He says that the car came to a smooth stop without any jolt and that the plaintiff, in attempting to step from the step of the car to the ground, turned her ankle and fell. He further relates that he and the motorman assisted the plaintiff and lifted her from the ground.

Val Meyer, defendant's next witness, testified that he was a passenger on the car, standing on the front end thereof on the left side of the motorman; that the car came to a smooth stop and that he saw plaintiff step from the platform; that when she put her foot from the step to the pavement, her leg or heel or ankle turned and she fell down. He also says that there were two other men on the front platform, besides himself and the motorman, and that these two men were talking at the time of the accident.

Defendant next produced the conductor, who testified that while he did not see the accident, he knows that the car came to a smooth stop; that irrespective of signal lights on Canal street, under the rules of the company, the car is bound to stop at the corner of Dauphine street for the purpose of taking on or discharging passengers. He further says that there was no jolt in the stop made by the motorman, because if there had been a jolt he would have felt it.

The last witness of the defendant, who claims to have seen the plaintiff fall, is the motorman. He relates that the brakes of the car were in good condition, and that at the time of the accident he brought his car to the usual stop without any jolting or jarring. He said that two or three passengers had gotten off the front end of the car when he noticed the plaintiff getting up from her seat; that she walked to the front of the car and proceeded to get off; that while putting her foot down to the ground, it appeared as if she twisted her ankle, fell over, and naturally broke her leg.

■ It will be seen from the foregoing that the testimony of the defendant's witnesses, if believed, completely destroys the evidence tendered by the plaintiff. As is usual, in these cases, the court must adopt the testimony of one side or the other. Counsel for plaintiff maintains that defendant's witnesses have concocted their story, and contra, counsel for defendant claims that plaintiff and her witness are falsifying.

In view of the flagrant conflict, we believe that the physical facts of the case may be helpful in determining the true state of facts. The plaintiff, at the time of the accident, was a healthy young woman, 30 years of age. The plaintiff says that, as she was thrown from the platform of the street car, her right leg struck the neutral ground and that said leg broke as a result of the terrific pressure to which it was subjected because of the manner and height of her fall. On the other hand, the defense witnesses would have us believe, that the plaintiff, in placing her right foot to the ground from the step of the street car in the usual manner, twisted or turned her ankle or leg, causing her leg to break, without any other stress being placed upon the limb. While we do not say that it is or would be impossible for plaintiff to break her leg while walking off the step of the street car in an orderly manner, still, in the absence of evidence showing that her ankle was actually twisted, it seems highly improbable that her leg would break under such circumstances. We believe that the breaking of plaintiff's leg might more reasonably be expected, where the fall was such as pictured by her in her version of the accident.

Notwithstanding the charge made by the defendant that she was wearing high heel shoes which unbalanced her, we find the shoes which she had on at the time of the accident were ordinary business women's shoes, having a heel not over two inches in height.

In order to deny the plaintiff recovery, we would have to say that her testimony and that of her witness, Miss Sallettes, is false, when there is nothing in the record which would warrant our coming to that

conclusion. Her evidence, to our mind, is substantiated by the physical facts of the case. Moreover, her story was believed by the jury, who saw and heard the witnesses, and therefore, in the absence of obvious error, it is manifestly our duty to adopt it as clearly preponderating over the version of the defendant.

 Having determined that the defendant is liable for the plaintiff's injuries, we now consider the question of quantum of damages. The suit is for $8,000 and the judgment below is for $3,460. Plaintiff has asked for an increase in the award. The injuries, as testified to by Dr. E. D. Fenner, chief surgeon in charge of the white female practice service at the Charity Hospital, consist of a fracture of the tibia and fibula somewhere around the junction of the middle lower third of her right leg. Dr. Fenner states that it was unquestionably a serious fracture. On the other hand, there is no evidence tending to show that her injuries are permanent. Dr. Fenner says that while the injured leg is slightly shorter than the other, it is not perceptible, and does not impair her ability to walk. In view of this evidence, we feel that the jury's award is adequate, and compensates the plaintiff fully for her injuries.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.