[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 290 
Plaintiff, Joshua Blackburn, claims of defendant, Lewis Chenet, the sum of $25,000 for personal injuries, alleging that while in the employ of said Chenet he sustained serious physical injuries which were "the result of negligence on the part of said Chenet in furnishing him with a wild and untamed" mule. He alleges that he was employed by defendant to peddle fruit and vegetables in a wagon owned by Chenet, and, by inference, alleges that since the business in which Chenet was thus engaged was not within the list of those specifically contemplated by the Workmen's Compensation Law, Act No. 20 of 1914, as amended, being nonhazardous, the compensation act has no application, and that, therefore, Chenet is liable in damages. In the alternative, however, Blackburn prayed that if it be held that the occupation in which the said Chenet was engaged comes under the act, he, plaintiff, was employed to perform work of such a nature as to make the statute applicable, and that Chenet is liable to him in compensation for $20 per week for 400 weeks, since he has been, according to his allegations totally and permanently disabled.
The defendant filed an exception of no cause or right of action and, at the same time, filed an answer. He denied that Blackburn was his employee, and averred that Blackburn was an independent contractor, engaged in the selling of fruit and vegetables for his own account, and that he, defendant, only rented the wagon and mule to plaintiff and advanced him the necessary funds for the purchase of the stock to be sold from the wagon. Defendant disavows negligence on his part and denies any indebtedness to plaintiff.
The record does not show that the exception was ever passed upon by the trial court, and we take it, therefore, that it was overruled.
After a trial on the merits there was judgment dismissing plaintiff's suit, from which judgment plaintiff has prosecuted this appeal.
In advance of our hearing the case on its merits, plaintiff filed a motion to remand the case to the Civil District Court for the Parish of Orleans, in order that he might be afforded an opportunity to introduce certain newly discovered evidence which, according to the motion and the affidavits appended thereto, is of transcendent importance to his cause.
We considered that the motion to remand was prematurely filed and, for that reason, did not pass thereon, conceiving it to be our duty to hear arguments and consider the merits of the case, since when an appellate court remands a case, it is necessary to set aside the judgment, which the court cannot do without first considering whatever evidence is in the record. L. A. Frey Sons v. Town of Slidell, 173 La. 397, 137 So. 193; Mayer v. Barrow, 182 La. 983, 162 So. 748.
There is no question but that an appellate court should remand a case for the reception of additional evidence whenever the nature and extent of the proceedings require it, and such action is largely within the court's discretion and should be exercised according to the peculiar exigencies of the case, especially when such action is consonant with the ends of justice. Code of Practice, art. 906; McClung v. Delta Shipbuilding Co., La. App., 33 So.2d 438.
Plaintiff's counsel does not pretend that such additional evidence would raise any new point of issue or exclude any existing issue. We have carefully examined the record, which contains 193 pages of transcribed testimony, and we find that there is considerable evidence touching upon the point which counsel stresses in the motion as being of such vital importance to plaintiff's cause that we should make the remand in order to permit the reception of *Page 291 
the new evidence. We believe that the case can be properly adjudicated upon the record as it is now constituted, and that the evidence which counsel desires to produce would be merely additional and cumulative to the evidence already submitted. The motion to remand is, therefore, denied.
When this case was called for argument, counsel for appellee made no appearance. However, he belatedly filed his brief in which the exception of no cause or right of action is reurged, the brief being chiefly devoted to argument thereon. Counsel contends that the alleged arrangement between Chenet and Blackburn contains all of the elements of a partnership or joint-adventure, and that Chenet owed no duty whatever to Blackburn respecting the rule. We find no merit in the exception. As will be pointed out hereinafter, Chenet's status was that of employer of Blackburn, and the allegations of the petition sufficiently set forth that fact.
It is contended by plaintiff that the business arrangement between himself and Chenet was as follows: Chenet owned several mules and wagons which were used by various other persons and himself in the peddling of fruit and vegetables on the streets of New Orleans, Chenet providing the funds with which each driver purchased his stock; that at the termination of each venture, out of the gross sales receipts, there was first refunded to Chenet the amount which he had advanced for the purchase of the stock, and then the balance remaining was equally divided between Chenet and the peddler.
Chenet has an entirely different version. He claims that he had only one mule and one wagon — the one used by Blackburn — and says, too, that there was no arrangement for the division of the profits. On the contrary, according to him it was understood that out of the receipts of sales he was reimbursed for his advances for the purchase of the stock and that, in addition thereto, he was to be paid about $2.50, $3, or $3.50 per day for the use of his mule and wagon. He said, referring to the peddlers, "I trust them to their own honor. * * *" It is interesting to note about this particular feature of the testimony that after insisting that he only owned one mule and wagon, Chenet delved into a lengthy discussion of his arrangement with "these peddlers who operate the wagons," and proceeded to say that "they" (using the plural) often make nothing and, therefore, give him nothing.
While insisting that he owned only one wagon, Chenet admitted that he kept five wagons in his yard, explaining that but one was his own and that the other four belonged to another person. On cross-examination, however, he admitted that his name and address was painted on the side of each of the five wagons.
Viewing all of the circumstances, Chenet's statement that all peddlers who operated his wagons gave him sometimes $2.50, $3, or $3.50, and sometimes nothing at all, does not appear to us to be reasonable. We think the truth was testified to by the plaintiff.
It is necessary to determine whether Blackburn was in the employ of Chenet. It is often difficult to determine the relationship between two persons, i. e., whether they are independent contractor and contractee, or master and servant. Frequently the line of demarcation between an independent contractor and an employee is so faint as to be almost indistinguishable. However, of course, the first inquiry into the question is whether there was the right to control, but yet it is not always that an employer has the sole right to control the movements of his employee. We discussed this in Buettner v. Polar Bar Ice Cream Co., La. App., 17 So.2d 486.
Nor is it always of importance that there was or was not a regularly stipulated salary, as it often happens that an employee is engaged solely on a commission basis. Nor is it decisive of this issue whether a conveyance furnished by one or the other of the persons is used. This question was also discussed in the Buettner case and in the case of Shea v. Reems, 36 La. Ann. 966.
In Shea v. Reems, supra, the plaintiff-wife was run over by a wagon owned by the defendant, and she and her husband *Page 292 
brought an action in damages against him. The court was concerned with the question whether the driver of the wagon was in the employ of the defendant. The driver peddled defendant's goods at a particular wage plus an additional compensation of two per cent on the price of all goods sold, with the privilege of keeping any excess of price for which he sold the goods over and above the price limited by defendant. The court held that the driver of the wagon was the employee of defendant.
The distinction between the Shea case and the instant one is that in the former the driver received a fixed salary, plus commissions, while in the latter Blackburn worked for a commission of fifty per cent of the net profits on the sales.
The record does not set forth whether Chenet retained the right of control over the movements of his various peddlers, but we feel sure that he had the right to terminate the relationship of any of them at any time. It is apparent that as a matter of fact Chenet's interest in the success of plaintiff's operations, as well as in the operations of the others who drove his wagons, was considerably greater than he would have us believe. He was engaged in the business of selling fruit and vegetables through those who undertook to drive his wagons, and those who did drive the wagons were his employees, engaging themselves on a commission basis.
Revised Civil Code, art. 163, says that servants are those: "* * * who let, hire or engage their services to another in this State, to be employed therein at any work, commerce or occupation whatever for the benefit of him who has contracted with them, for a certain price or retribution, or upon certain conditions."
It will be noticed that, according to the codal article, a servant may be employed for a certain price or retribution, or upon certain conditions, and our opinion is that article 163 was intended to include within its scope such employment as Blackburn's.
Adverting now to the alternative prayer of Blackburn that he be awarded workmen's compensation for 400 weeks at the maximum rate, we must first determine whether the employment was such as to bring Blackburn within the contemplation of the Compensation Act, because if the act is to control, the claim for compensation would be exclusive, and no action in tort would lie.
As has been often said, the only occupations which bring the parties under the statute are those which, being considered hazardous, are specifically detailed in the act. An employment cannot be treated as being hazardous unless it is, by a fair construction of the act, declared so to be. The operation of an animal-drawn vehicle is not one of those occupations.
This court passed upon this question in the case of Alexander v. Tharp-Bultman-Southeimer Company, No. 7373 of our docket (unreported), Opinion Book 57, decided January 10, 1921. See Louisiana and Southern Digest. We there said:
"In the long list of 'hazardous' occupations enumerated in (par.) 2 of Sec. 1 of the Act (20) of 1914, we fail to find that of driver of carriages or vehicles, or any other occupation which, by a reasonable or liberal interpretation, could be assimilated to that of carriage-driver; * * *
"This question has already received our attention in the case of Dejan v. Ujffy, 14 [Orleans] App. 230. In that case we decided that the driver of a freight and delivery wagon drawn by a mule employed by a wholesale dealer in fruits did not come within the occupations designated as hazardous in the Statute of 1914."
See also Franz v. Sun Indemnity Co., La. App., 7 So.2d 636, and Hecker v. Betz, La. App., 172 So. 816.
Concluding that the occupation of Chenet was nonhazardous and without the purview of the act, the next point to be determined is whether Blackburn is entitled to recovery based on his claim that his employer, Chenet, was derelict in the duty of furnishing him with a safe place to work or with tools or implements not defective, to wit: a mule of "vicious propensities" and of a "wild and untamed nature."
It is well settled jurisprudence that the master is liable in damages for personal *Page 293 
injuries suffered by his servant because an unsafe place in which to work is furnished, or because of a defect in an appliance furnished for the performance of the servant's work, if the master knew the appliance was defective, or could have discovered the defect by proper inspection. See the many cases cited in Vol. 13 Louisiana Digest, Master and Servant, 101 and 102.
We have been unable to locate a case wherein an appellate court in this state passed upon the question whether the furnishing to an employee by the master of a vicious or unruly animal constitutes a failure to furnish a safe place to work, or to furnish an instrumentality or appliance not defective. But there is little doubt in our minds that when an employee is engaged to drive a mule, it is the master's duty to furnish him with one which can be driven with reasonable safety, just as much as it is the duty of the master to furnish his employee with a safe mechanical instrumentality or appliance. It has been so held in several other jurisdictions. In Vol. 56 C.J.S., Master and Servant, § 218, page 927, we find the following statement of the general law: "The rule that a master must use reasonable care to furnish his servant with reasonably safe instrumentalities extends to and includes horses and other animals used in his work, wagons, and other vehicles, harnesses, and appliances connected therewith. Thus, when a master knows or should know that an animal used by him is vicious or that his harness or vehicle is not reasonably safe, he is liable for injuries to his servant caused thereby. Although ordinarily knowledge, actual or constructive, on the part of the master of the vicious nature of an animal furnished to a servant is essential to liability, it has been held that the liability of the master is governed rather by his duty to use reasonable care to furnish the servant a reasonably safe instrumentality with which to perform his work. * * *"
Blackburn had been in Chenet's employ off and on for about twelve to fifteen years. The accident happened on Sunday, August 24, 1947. It seems to have been the custom for the drivers to hitch the mules to the wagons they were to use, but on the day of the accident this was not adhered to insofar as Blackburn was concerned. When he reported to Chenet about 8 o'clock, a.m., to take out his wagon, he learned that Chenet and plaintiff's brother had hitched the mule and had driven off before Blackburn's arrival. Blackburn met the wagon at the corner, and Chenet said to him: "Go with your brother and catch the customers."
There is no dispute as to how the accident occurred. Plaintiff had never driven the mule before. He saw the mule for the first time the preceding day, when it was in Chenet's yard tied to the wheel of a wagon. After meeting the wagon on the Sunday morning, Blackburn climbed aboard and proceeded along his route, plaintiff's brother walking alongside the wagon, with Blackburn doing the driving. After proceeding thusly for about six blocks, the mule reared and kicked and started off at a fast gallop, continuing its flight across the railroad tracks at Galvez and Poydras Streets, and because of the bouncing of the wagon Blackburn was thrown to the ground and two of the wagon's wheels ran over his right leg.
Chenet bought the mule three days before the accident from one Oramus, who testified that he had used the mule for about three and a half years in farming operations at Slidell, Louisiana. Oramus stated that it was gentle and at times was used to pull a farm wagon in and out of the fields. But if this statement of Oramus be true, a decided change came over the mule after Chenet acquired it. Eight witnesses testified as to its character, and a careful analysis of their testimony as a whole convinces us beyond doubt that the mule, as alleged by plaintiff, was of "vicious propensities" and of a "wild and untamed nature," which was well known by Chenet.
One witness testified that on the day preceding the accident, while sitting on her gallery, she heard some people "hollering." She investigated the source of the commotion and saw the mule, which she described as a "young looking mule and dark," hitched to a wagon. The driver of the wagon was pulling back on the reins and Chenet *Page 294 
was on foot leading the mule with a rope tied around its mouth. The mule was kicking and rearing.
Another witness also saw the mule on the morning of the preceding day. Chenet and another man, whom she identified by name, were attempting to tame the mule by driving it around hitched to a heavy drag consisting of crossties cut into blocks. Chenet drove the mule and the other man led it by a rope tied around its mouth. The animal acted wild, and pedestrians hastily left the sidewalk. Later on that day this witness saw Chenet and the man driving the wagon to which the mule was hitched, and said that one of the wagon wheels had been locked and was dragging. The mule nearly turned the wagon over at the corner. The witness further said that while Chenet was hitching the mule to the wagon, he heard Chenet's wife calling to him, saying: "Come out of there; that old mule will kill you."
Another witness, Williams, saw the mule pulling the wagon with the locked wheel. The wheel was chained and the mule would stop and "acted funny." The driver got off the wagon and the mule was led off.
Stewart, defendant's tenant, testifying for Chenet, said on cross-examination that Chenet offered him $3 to drive the mule which was hitched to a wagon, but that Chenet declined to ride in the wagon with him.
That Chenet bought unbroken animals is shown by the record. It was testified to that he did this because he could get green animals cheaper, would break them in himself, and then put them to use in his business.
An attempt was made to show that Blackburn violently hit or kicked the mule, causing it to become unruly and run away, but the testimony on that feature is not impressive. Plaintiff denied emphatically that he hit or kicked the mule. Blackburn's brother, who appeared on behalf of defendant, testified that Blackburn touched the animal with the reins and touched its tail with his foot, which caused the mule to run away. The brother classified the mule as "touchy," and said that he would be afraid to drag his foot on its tail.
The irritable and unstable nature of the mule having been clearly shown, we readily reach the conclusion that defendant is liable to plaintiff for whatever damages were caused to the latter. Defendant signally failed in the duty imposed upon him by law to have furnished Blackburn with a safe place in which to do his work by furnishing him with a mule which could not be handled or driven with reasonable safety.
Should we have committed error in concluding that the relationship of master and servant existed between the parties, nevertheless under the law defendant would still be liable for Blackburn's injuries.
For the purpose of this opinion, accepting as true the testimony of Chenet regarding the arrangement with Blackburn, i. e., that when the peddlers returned their wagons, he received from them $2.50 to $3.50 for the use thereof, it seems to us that such arrangement would place the parties in the category of lessor and lessee.
R.C.C. art. 2676 reads as follows:
"The letting out of things is of two kinds, to-wit:
"1. The letting out houses and movables.
"2. The letting out predial or country estates."
According to R.C.C. art. 2678: "All corporeal things are susceptible of being let out, movable as well as immovable, excepting those which can not be used without being destroyed by that very use."
R.C.C. art. 2695 sets forth the lessor's guaranty to the lessee respecting vices and defects in the subject matter of the lease as follows: "The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."
The latter article has been applied in many cases to allow the lessee to recover *Page 295 
damages for personal injuries caused by vices and defects in the thing leased. See Schoppel v. Daly, 112 La. 201, 36 So. 322; Thomas v. Catalanatto, La. App., 164 So. 171; Coleman v. Rein, La. App., 4 So.2d 622; Bates v. Blitz, La. App.,13 So.2d 516.
We have made a careful search of Louisiana jurisprudence, and have been able to find but one case involving a claim for damages caused a lessee by a leased animal. In Willis v. Schuster, La. App., 28 So.2d 518, our brothers of the Second Circuit were confronted with a suit to recover for injuries sustained by the plaintiff who was thrown from a horse which he had rented from a riding academy owned and operated by the defendant. While riding the horse, it became frightened by a burst of music from a band, ran away, slipped and fell, causing the plaintiff's injuries. It was plaintiff's contention that the defendant and his employee were negligent in furnishing a horse which they declared was gentle when they knew it was of a nervous disposition and easily became frightened. The court, after finding that plaintiff failed to establish by sufficient evidence that defendant had knowledge of the dangerous nature of the horse, dismissed the suit. R.C.C. art. 2321, which makes the owner of an animal answerable for the damage he has caused, was applied, but no mention was made of R.C.C. art. 2695, which cast liability upon the lessor for damages occasioned by vices and defects in the thing leased. An interesting discussion of the case will be found in Tulane Law Review, Vol. 21, p. 697. The author of the article, in conclusion, comments as follows: "* * * Since the instant case involved the hiring of a horse, the court in making its decision should have considered the applicability of Articles 2678 and 2695 of the Louisiana Civil Code of 1870. It is submitted that if Article 2695 rather than Article 2321 had been applied, a different result would have been reached because it would have been unnecessary for plaintiff to prove that defendant lessor had knowledge of the dangerous nature of the horse."
But be that as it may, if the result reached was correct, Chenet is still liable in the instant case, for he, unlike the defendant in the cited case, well knew that his mule was unbroken and of a mean and vicious disposition and was unsafe to be put in use as a draft animal.
If the relationship of lessor and lessee existed between the parties, it cannot be doubted that Chenet is liable under arts. 2678 and 2695. If any other relationship existed between them, then liability would effectively attach to Chenet under the plain provisions of art. 2321, which protects the general public for injuries inflicted by an animal if the owner be at fault. That article reads: "The owner of an animal is answerable for the damage he has caused; but if the animal had been lost, or had strayed more than a day, he may discharge himself from this responsibility, by abandoning him to the person who has sustained the injury; except where the master has turned loose a dangerous or noxious animal, for then he must pay for all the harm done, without being allowed to make the abandonment."
For treatment for his injuries, Blackburn was taken to Charity Hospital and remained in bed for about two and one-half months. He used crutches for about six months, and afterwards used a cane. His right leg was broken and was encased in a cast for about five months.
Dr. Maurer, who appeared for plaintiff, was the only medical expert who testified. He first saw Blackburn on April 18, 1948, and X-rays made by him showed old healed fractures of the shaft of the tibia and fibula at the junction of the middle and lower third of Blackburn's right leg. He noticed that the right leg was one-half inch shorter than the left. Dr. Maurer stated that while Blackburn walked with a limp, he did not require the use of a cane. There was still some swelling of the ankle, and up and down motions were about eighty per cent normal. The motion of the toes showed limitation of thirty-five per cent. Dr. Maurer believed that Blackburn, when he saw him on April 18, 1948, was incapacitated from returning to his occupation. However, the doctor made another examination of plaintiff on the day of the trial below, and concluded that Blackburn was then able to return to the duties of his occupation and that he could readily get on and off a wagon and peddle fruit. *Page 296 
Blackburn, who is 34 years old, testified that prior to the accident he made from $30 to $35 per week. Dr. Maurer was unable to state just when Blackburn's disability ceased between April 18 and July 14, 1948.
There is no doubt that plaintiff's injuries were serious and that he suffered greatly for some time as a result thereof. The record does not reveal what medical expenses, if any, were incurred by plaintiff. According to the uncontradicted testimony of Dr. Maurer, Blackburn was incapacitated up to the time of his first visit to the doctor, and was, therefore, deprived of his earning power for about thirty weeks.
The assessment of damages for personal injuries is lodged within the sound discretion of the court, and we believe that in this case an award of $3,500 would do substantial justice. This seems to be in line with awards made in cases involving injuries similar to those sustained by plaintiff. See Breaux v. Roussell (Maryland Casualty Co., intervenor), La. App., 151 So. 267; Dillon v. New Orleans Public Service, Inc., La. App., 170 So. 406; Lindsey v. Gulf Ins. Co., La. App., 7 So.2d 757.
For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be now reversed, and that there be judgment in favor of plaintiff-appellant and against defendant-appellee for the sum of $3,500, with legal interest thereon from judicial demand until paid, and for all costs of this proceeding.
Reversed.