JANVIER, Judge.
This suit for damages for personal injuries is brought by a seaman against the owner of a shrimping vessel on which the plaintiff performed services as a member of the crew. It is brought under Section 688, Title 46 United States • Code Annotated, — the Merchant Marine Act of June 5, 1920, § 33, 41 Stat. 1007, commonly called the Jones Act.
Plaintiff alleges that he was employed by the defendant on a profit-sharing basis and that his weekly earnings varied with each individual catch of shrimp, and that during the term of his employment his earnings had never been less than $100.00 in any one week and had amounted to as much as $357.00 in other weeks. He alleges that on November 15th, 1946, at 10:30 in the morning, while the vessel “Buddy” on which he was employed was engaged in shrimping operations in the Gulf of Mexico, about ten miles southeast of Grand Isle, Louisiana, there occurred an accident which was caused by the negligence of the' owner of the vessel, and that as a result of the accident a bone in the big toe of his right foot was fractured; that it became necessary to graft new skin on his injured foot, and that he suffered excruciating pain. Plaintiff prays for judgment for $15,000.00.
Plaintiff alleges that the accident occurred as he attempted, under orders of the defendant, to straighten a twist in a rope leading to a board or door, which was part of the front end of the trawl which had been dragged behind the vessel and that this board fell upon his foot causing the injury. .
Plaintiff further alleges that there was negligence in the owner of the vessel in the following particulars:
That he did not equip the vessel with a whip line and that he was not using the power winch which was available to haul the trawl aboard so that it could be straightened; that he did not stop the vessel before attempting to straighten the board; that he ordered plaintiff into a dangerous position and that the vessel was not seaworthy.
Defendant filed, first, a plea to the jurisdiction of the State court averring that “this suit involves an accident in admiralty which is cognizant only by the Admiralty Division of the United States District Court for the Eastern District of Louisiana and not by this Honorable Court.”
We are unable to determine from the record whether this plea was acted upon, though we assume that it was overruled since the defendant filed answer and the case went to trial on the merits.
Defendant admitted the occurrence of the accident and the details of the contract of employment, but averred that as a result of that contract plaintiff was a partner and not an employee of defendant and that therefore he could not maintain an ac- *204 tipn in damages against defendant. Defendant further denied that there was any negligence on his part, denied that the vessel was unseaworthy, and averred in the alternative that the accident resulted solely from contributory negligence of plaintiff himself.
There was judgment in favor of defendant, and plaintiff has appealed.
We find it clear that there is no merit in the exception to the jurisdiction of the State Courts.
Section 688 of the Jones Act, 46 U.S.C. A., reads as follows: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in the case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.”
It is true that in this section there is no unequivocal statement that there is concurrent jurisdiction in the State and Federal courts. However, this same question was considered 'by us in Macomber v. DeBardeloben Coal Co., La.App., 4 So.2d 483, and we found it to be settled as a result of many decisions of the Supreme Court of the United States. We cited Engel v. Davenport, 271 U.S. 33, 46 S.Ct. 410, 412, 70 L.Ed. 813, in which the Supreme Court said: “It is clear that the State courts have jurisdiction concurrently with the Federal courts, to enforce the right of action established by the Merchant Marine Act as a part of the maritime law.”
As we have already said the exception to the. jurisdiction is without merit.
We next give consideration to the contention of defendant that he and the plaintiff were engaged in a joint venture and that therefore there is no right of action in plaintiff since one partner may not sue another for damages for injuries sustained in the operation of the partnership.
Let us first set forth the admitted facts concerning the relationship between plaintiff and defendant. The vessel “Buddy” is owned by defendant, who, with plaintiff and a third member of the crew, Cheramie, operated the vessel under an agreement that such profits as might result from each fishing venture were to be divided into five parts; two to go to the owner of the vessel as the vessel’s share, one to the owner as his share, one to Cheramie, and one to plaintiff. Plaintiff was not to share in the losses, if any. The vessel was at all times under the sole management and control of defendant and the entire catch on each occasion was sold by the defendant who made the distribution of the proceeds.
That the defendant Persohn was in complete control is shown by his own testimony:
“Q. Do you consider the captain of the boat gives the orders? A. Yes.
* * * * * *
“Q. Well, if that boat were in grave danger, would you have the say so as to the destiny of the vessel? A. That’s right.
* * * * * *
“Q. Who has the say so as to where you fish? A. The captain does.
“Q. You do, as to your boat? A. Yes; that’s correct.
“Q. Suppose you wanted to fish in one place, and the deck-hands wanted to fish in another — what would happen then? A. It would be just too bad. They would have to fish there till the end of the trip. * * * ”
In corroboration of the other evidence to the effect that defendant was in complete control of the vessel, plaintiff gave the following testimony:
“Q. Were you, at all times when you were on the boat, subject to the orders from Captain Persohn? A. Yes, he is the captain. What he says goes.
*205 “Q. In making an effort to grab this trawl board, were you acting under the orders of Captain Persohn? A. That’s right.”
While there seems to be no dispute over the question, the following testimony shows that even as to the sale of the shrimp plaintiff had nothing to say, this being completely under the control of the defendant:
“Q. I imagine you sold the shrimp and divided the money; is that right ? A. No, Captain Persohn sold the shrimp.
“Q. Captain Persohn handled the disposal of the shrimp at the market; isn’t that right? A. Yes.”
It is well established, both in the Federal jurisprudence which has grown out of the operation of the Jones Act, and in the jurisprudence of this State in cases involving the question of what is necessary to constitute a partnership, that the major factor in determining whether an individual is a partner or an employee is his right or lack of right to exercise control.
In Glaser v. Katalinich, 169 Wash. 133, 13 P.2d 468, 471, the contract was quite similar to that which is found here with the exception of the fact that there the contract provided also for the sharing of the losses. The Supreme Court of Washington held that the contract did not create a partnership since the plaintiff had no right of control. The Court cited Domandich v. Doratich, 165 Wash. 315, 5 P.2d 310, in which it had been held that the plaintiff was not a partner and was not engaged in a joint venture. The Court, referring to the various employees in the same category with plaintiff, said that none of them had .a voice in the control of the vessel, nor had anything to say as to where the fishing would be done, nor as to the manner in which they would perform their various duties. Finally, the Court said: “ * * * They were still mere seamen subject to the orders of the captain to the same extent as if they had been employed at a fixed wage, payable regardless of the profits of the venture.”
In Norland, 9 Cir., 101 F.2d 967, 972, is found the following: “ * * * Also inconsistent with the theory of joint venture is the indication in the testimony , of Pete Johnson that the- crew was controlled as to where the fishing wag.to be done, the labor to be performed, and even as to the manner of the performance of their labor, by the orders of Loe and Captain Ball. * * * This last factor points to. the existence of an employer-employee relationship between the owner and the crew. * * $»
In Louisiana the principle is well settled that there is no partnership unless there is a joint right of- control. In Blackburn v. Chenet, La.App., 42 So.2d 288, an owner of a mule and wagon made a contract with the driver under which the owner provided the cash for the purchase of vegetables. The driver drove the wagon, peddled the vegetables, and then made settlement with the owner of the wagon. We held that the driver was not a partner of. the owner of the wagon. We cited Buettner v. Polar Bar Ice Cream Co., La.App., 17 So.2d 486 and Shea v. Reems, 36 La.Ann. 966, in each of which it had been held that a contract somewhat similar did not create a partnership.
Before discussing the details of the occurrence of the accident, it may be well to refer briefly to the legal effect which may be given to the fact that the defendant, in his answer, in the alternative averred that the accident had resulted from the contributory negligence of'the plaintiff and also to the fact that in oral argument counsel for defendant contended that the accident was one of a type which might be expected in occupations of that kind; that the risk was one inherent in that kind of work and in effect therefore that plaintiff could not recover in any event because he had assumed the risk of such an accident.
It will at once be noted that section 688 of the Jones Act provides that in an action brought thereunder “all statutes of the United States conferring or regulating the right of action for death in the case of- railway employees shall be applicable.” The reference, of course, is to the Federal Employers’ Liability Act and particularly to sections 51 through 60 of the Title Railroads, United States Code Annotated, Title *206 45. Reference to that statute discloses the fact that by section 54 it is provided: “That in any action brought against any common carrier under or by virtue of any of the provisions of this chapter * * * such employee shall not be held to have assumed the risks of this employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; * *
It is obvious then that, if there was any negligence on the part of the owner, the right of the employee to recover may not be defeated on the ground that he assumed the risk of his employment.
Nor may the contention that contributory negligence of the employee was the cause of the accident be availed of to entirely defeat his right to recover, for the reason that in section ,53 of the Employers’ Liability Act, which by the reference to which we have already mentioned is made applicable in cases of this kind, it is provided that contributory negligence shall not prevent recovery, “but the damages shall be diminished * * * in proportion to the amount of negligence attributable to such employee.”
Concerning both the defense of assumption of risk and the defense of contributory negligence, in Ducombs v. Lykes Bros. S. S. Co., La.App., 1 So.2d 114, 115, we had this to say:
“In volume I of the Law of American Admiralty by Benedict, Sixth Edition by Knauth, at page 50, we find the following:
‘“The gravamen of a Jones Act suit is negligence; the defence of common employment (the fellow servant rule) is abolished, and the doctrine of assumption of risk is profoundly modified. If a statute relating to safety devices is not complied with the seaman assumes no risk whatsoever. Contributory negligence is not necessarily a complete defense; the damages may merely be reduced proportionately.’ ”
We, therefore, pass to a consideration of the facts of the accident in an effort to determine whether there was negligence on the part of the owner, and if so, to what extent any contributory negligence on the part of the employee may reduce the amount of an award which may be made.
There is some slight dispute as to whether the accident occurred on November 15th or November 17th. There is no reason for us to decide this most unimportant question.
The accident occurred in the following manner: The vessel was what is known as a trawl boat which catches shrimp in a net known as a trawl, which is dropped from the stern and dragged behind the vessel, the front end being held open by two large boards known as doors. These boards are rectangular and are about thirty inches in height and several feet long. They are so attached, one on each side of the front end of the trawler that the pressure of the water as they are pulled through it spreads them apart, one to the right, the other to the left, with the result that the opening between them into the trawl is quite large. These boards are very heavy, weighing about 200 pounds each, there being attached to the lower edge of each a piece of heavy metal so that each board will “ride” upright as it is pulled through the water. After each haul the vessel is stopped and these boards are lifted to the rear deck and then the trawl itself is pulled in and the catch removed. Sometimes, because of rough weather, the ropes, which extend from the vessel to these boards, become twisted so that it is necessary to pull them to the deck and to remove the twist by turning the boards one way or the other.
Plaintiff states that on the morning of the accident, as these boards were pulled to the deck, it was noticed that there was a twist in the ropes leading to one of them and that a third member of the crew, Cheramie, together with the defendant, attempted to straighten the board but that Cheramie, being younger and not having sufficient strengh, could not do the job and the defendant, owner and master of the vessel, ordered plaintiff to exchange positions with Cheramie and to remove the twist by turning the board over. He says *207 that the board was partially on the deck, but that the end extended out over the rail- and that he put his foot upon this rail and reached out as far as he could to grasp and turn over the very heavy board, and that as he was turning it over the board slipped and crashed down upon his foot causing the injury.
The principal charge of negligence which plaintiff makes is based on the fact that at the time of the occurrence the vessel was not equipped with what is known as a “swing line”, and plaintiff also charges that defendant was negligent in that he did not order the use of a winch and other tackle which was available, and in that he did not stop the vessel completely before attempting to adjust the twist in the line leading to the board.
Plaintiff charges that a swing line is a necessary part of the equipment of the trawl boat and that if there had been one on the Buddy it could have been used to pull up the board, with the result that plaintiff would not have had to put his foot on the rail and would not have had to lean far out over thé side of the vessel; and he says that the board could not have slipped and fallen upon his foot if it had been raised from the water by a swing line.
We find in the record no detailed description of a swing line. However there is enough evidence concerning such a device to enable us to understand in a general way what it is. It seems to be a rope, with a hook or catch on one end and with the other end attached to a drum or pulley or some power- device in such a way that when the catch-is affixed to the board and the power applied to the other end of the rope, the board is lifted from the water and can ea sily be deposited upon the deck of the vessel. It is conceded that the Buddy did not have such a swing line at the time, and it is also conceded that since the accident a swing line has been added to her equipment.
Defendant admitted that most trawl boats are equipped with swing lines. In fact' he said that about seventy-five per cent of them are so equipped. Plaintiff says that practically all such vessels are so equipped and Cheramie, the third member o-f the crew says that he had not worked on any boat without such a line until he was employed on the Buddy.
We conclude that there is no doubt at all that it is very predominantly the custom to have such lines and in fact it is almost conceded that this is true, but on behalf,of, the defendant it is argued that while it is customary to have such lines, they are not in fact used for the purpose for which plaintiff says they should have been used had there been- such a line on the boat. Defendant contends that such lines are used for the purpose of pulling the trawl out .of the water for drying at the completion of each day’s operation. Defendant says also that while there was no such swing line on the Buddy, there was other tackle which could have been used for the same purpose.
From the evidence adduced we cannot escape the conclusion that had the swing line been used, or had other available tackle been substituted for the swing line, the accident would not have taken place, and therefore we cannot avoid the further conclusion that the accident resulted either from the fact that there was no swing line available, or from the fact that defendant, who was in complete charge of the operation, ordered plaintiff to raise the board by hand instead of making use of other tackle. ' In either event, we think it evident that there was negligence on the part of defendant in failing to equip his vessel with the proper line, or in failing to make use of other equipment, and thus requiring that the operation be performed in a dangerous manner.
We think also that it appears from the record that it would have been -much safer to have stopped the vessel. completely in view of the fact that there was a considerable sea running and that this added to the danger. ,
In determining what is negligence, it is well settled that a considerably higher standard of care is required of the operator of a vessel than is required of an employer on shore.
In Koehler v. Presque-Isle Transp. Co., 2 Cir., 141 F.2d 490, 492, it was held that:
*208 “ * * * the obligation of a shipowner to his seamen is substantially greater than that of an ordinary employer to his employees.”
In Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 459, 88 L.Ed. 561, appears the following: “We have often had occasion to emphasize the conditions of the seaman’s employment * * * which have been deemed' to make him a ward of the admiralty and to place large responsibility for his safety on the owner. He is subject to'the rigorous discipline of the sea, and all the conditions of his service constrain him to accept, without critical examination and without protest, working conditions and appliances as commanded by his superior officers.”
In Jamison v. Encarnacion, 281 U. S. 635, 50 S.Ct. 440, 442, 74 L.Ed. 1082, the Supreme Court of the United States said:
“ * * * The act is not to be narrowed by refined reasoning or for the sake of giving ‘negligence’ a technically restricted meaning. It is to be construed liberally to fulfill the purposes for which it was enacted, and to that end the word may be read to include all the meanings given to it by courts, and within the word as ordinarily used. * * *
* * * * * *
“ ‘Negligence’ is a word of broad significance and may not readily be defined with accuracy. Courts usually refrain from attempts comprehensively to. state its meaning. While liability arises when one suffers injury as the result of any breach of duty owed him by another chargeable with knowledge of the probable result of his conduct, actionable negligence is often deemed—and we need not pause to consider whether rightly—to include other elements. * * *
* * * * * *
“ * * * unquestionably the employer would be liable if plaintiff’s injuries had been caused by mere inadvertence or carelessness on the part of the offending foreman * *
Nor do we think that it can be said that plaintiff was guilty of contributory negligence in placing his foot upon the rail and in reaching out over the water to grasp the end of the board. We are convinced that he told the truth when he said: “There was no other way to catch the board.” He was asked: ' “Could you have gotten in reach of that trawl board without getting on the railing? ” and he answered:
“No. No one else can do it either.”
A seaman is not at fault in doing what he is ordered to do unless it is obvious that to carry out the orders given him by the master of the vessel will almost certainly be extremely dangerous. In Hanson v. Luckenback S. S. Co., 2 Cir., 65 F.2d.457, 458, the Court said: “Being a seaman, it is well settled that plaintiff did not assume any risks involved in obeying orders.”
In Holm v. Cities Service Co., 60 F.2d 721, 722, the Circuit Court of Appeals, Second Circuit, said: “Where a seaman is injured when acting under orders, he does not assume the risk. Panama R. R. Co. v. Johnson, 2 Cir., 289 F. 964; Masjulis v. Shipping Board, 2 Cir., 31 F.2d 284. The defense of assumption of risk is not available when a seaman so injured sues to recover because his duty to obey the order of a superior is so compelling that a rule of law based on the maxim ‘volenti non fit injuria’ cannot be applied. * * * ”
In Crickett S. S. Co. v. Parry, 2 Cir., 263 F. 523, 525, appears the following: “The defendant contends that -the plaintiff cannot recover because he shipped with knowledge of the condition complained of, and because, so far as the wire rope is concerned, proper rope could not be obtained. * * * We are considering the rights of seamen, who have constituted from early times a peculiar class. The unusual protection extended to them is reflected in the familiar saying that they are the wards of the admiralty. As to the second proposition, shipowners cannot justify furnishing them with defective and dangerous appliances on the ground that they knew of it. * * * ft
In conclusion let us say that we are not impressed with the sincerity of defendant, and notice that in various parts of his tes *209 timony he found it convenient to avoid admitting knowledge of things which he must certainly have known. For instance, although he was standing about five feet away and says that he was looking at the board, he also says that he did not know that it had fallen on plaintiff's foot. He added: “I was not looking at his foot.”
Our conclusion is that the accident was caused by the negligence of the master of the vessel, who is the defendant, and that plaintiff was not himself at fault.
When we come to consider the amount to which plaintiff is entitled we note that there are certain facts which should be considered, but concerning which there is little, if any, evidence in the record. From the testimony of plaintiff’s physician we learn that by January 23rd, 1947, plaintiff had completely recovered and could do a normal day’s work. The accident occurred on November 15th, or possibly November 17th, and it therefore appears that he was disabled for a total period of more than nine weeks. He says that the most he had earned in any one week was $347.00 and the least $96.00. There is nothing to show what would have been an average week’s earnings, and we do not think that it would be proper to total the amount earned in the maximum week and the amount earned in the minimum week, divide that by two, and then say that the result represents the average weekly earnings. There are too many other factors which should be taken into consideration. For instance, there can be no doubt that on many days the vessel would have remained at home, and there can be no doubt that on other days, due to stress of weather or for other causes, no shrimping operations could have been conducted. The record does not show whether there was an open season for shrimping during the whole of the period in which plaintiff was unable to work.
Taking into consideration all of the evidence which .is available, we have reached the conclusion that plaintiff’s earnings during that period would not have amounted to more than $800.00. In addition, he should be allowed $125.00, which is the medical expense shown by the record.
Plaintiff’s physical injuries consisted of a fracture of the big toe with contusions and’ lacerations. His doctor stated that normally a fracture of that type would knit in ’ about six weeks' but that, due to an infection which had set in, a longer period was required. He stated too that the infection had been caused possibly by fluid from the shrimp in which plaintiff worked, or for some'Other cause of which there might have been no evidence, but that, whatever may have been the cause, there was 'an infection which complicated the situation and which retarded plaintiff’s recovery. Because of this infection it was necessary that, for a period of from two and one-half to three weeks, plaintiff soak his foot about four times each day.
In Cartwright v. Puissigur, 1910, 125 La. 700, 51 So. 692, the Supreme Court approved an award of $400.00 for physical pain and suffering for the mashing of two toes. Apparently there was no fracture. In Scarborough v. Louisiana Ry. & Nav. Co., 145 La. 323, 82 So. 286, 288, there was involved a claim on behalf of a child six years old. His right foot was badly mashed; his great toe amputated and his second toe dislocated. There was great pain and suffering. The Court said that “ * * * while there is disfigurement of the child’s foot which will be permanent, he will largely recover the use thereof, * * * the result of the injury will greatly disappear in the course of a few years, and * * * he will not be able to walk so well or so far as he would have walked with the great toe in its proper place.” There was an award of $2,000.00.
In DeCuers v. Crane Co., La.App.,1949, 40 So.2d 61, 70, plaintiff, a young woman, sustained “a fracture of the distal phalanx of the right great toe and chipped fractures of the terminal phalanges of the third and fourth fingers of the right hand.” She was required to remain in bed for one month and was partially disabled for an additional three weeks. For her physical injuries she was allowed $1500.00.
In the case at bar, while plaintiff was disabled for approximately ten weeks, he w.as not required to remain in the hospital for any perio'd at all. We think that,’ tak *210 ing into consideration all of the facts which do appear in the record, and considering the cases which we have cited, an award of $2000.00, which will include his medical bill, his loss in earnings, and his physical suffering and disability, would be substantially correct.
It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed, and that there now be judgment in favor of plaintiff and against defendant in the sum of two thousand ($2,000.00) dollars, with legal interest from judicial demand, and for all costs.
Reversed.