136 So.2d 852 (1961)
Thurman O'BRIEN
v.
TRADERS AND GENERAL INSURANCE COMPANY et al.
No. 5434.
Court of Appeal of Louisiana, First Circuit.
December 27, 1961.
On Application for Rehearing February 6, 1962.
Certiorari Denied March 28, 1962.
John Makar, Natchitoches, for appellant.
Borron, Owen, Borron & Delahaye, Durrett, Hardin, Hunter, Dameron & Fritchie, Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellee.
Before ELLIS and HERGET, JJ., and MILLER, J. pro tem.
*853 HERGET, Judge.
Honorable Paul B. Landry, Jr., Judge of the Eighteenth Judicial District Court, (now a member of this Court) for written reasons assigned in this case rendered the following judgment from which Plaintiff appealed:
"Opinion and Judgment "Filed February 5, 1960

"Judgment:
"By this action plaintiff Thurman O'Brien seeks to recover damages in the sum of $227,316.40 for alleged personal injuries reputedly sustained and incurred as the result of an automobile accident which occurred on U. S. Highway 190 near Livonia, Pointe Coupee Parish, Louisiana, on December 1, 1957, at approximately 5:30 P.M. Judgment in solido is prayed for against Traders and General Insurance Company (hereinafter referred to simply as "Traders"), Louisiana State University and Agricultural and Mechanical College (hereinafter referred to simply as L.S.U.) and The Insurance Company of the State of Pennsylvania (hereinafter referred to simply as Pennsylvania.)
"The petition alleges in substance that as plaintiff was proceeding easterly along the highway in the left or inside eastbound traffic lane (the highway being a four lane highway running east and west with two eastbound and two westbound lanes on either side of a separating neutral ground) his automobile was struck from the rear by the eastbound vehicle of one Austin W. Johnson proceeding in the same direction as plaintiff. Traders is the liability insurer of the vehicle owned and being driven by Johnson; L.S.U. is Johnson's employer and Pennsylvania is the liability insurer of all L.S.U. employees.
"Defendant L.S.U. filed an exception asserting its immunity from suit as an agency of the State of Louisiana which said exception was sustained by the Court and plaintiff's complaint dismissed as to this particular defendant. Accordingly the sole remaining defendants are the insurance companies hereinabove named.
"Although negligence on the part of Johnson is not conceded by defendants, it is not seriously disputed. In this connection the evidence shows that the accident occurred on the open highway at which time plaintiff was traveling at a moderate rate of speed in the inside eastbound traffic lane. Plaintiff reduced the speed of his vehicle to approximately five miles per hour to avoid striking a preceding vehicle making a left turn through a break in the neutral ground. Johnson failed to timely note plaintiff's reduction in speed and although he applied his brakes he was unable to stop and struck plaintiff's vehicle in the rear. It is undisputed that the impact was relatively light, it being shown that Johnson was proceeding approximately 10 miles per hour at the moment of collision. The right front of the Johnson car struck the rear of plaintiff's automobile in the vicinity of its left rear fender with force sufficient to cause total damages of only $57.00 to plaintiff's car and $67.73 to the Johnson vehicle. Both vehicles traveled a very short distance after the collision and the testimony of plaintiff himself is to the effect the blow was so slight that it did not cause him to be thrown against the steering wheel or strike any portion of his body whatsoever.
"Considering first the manner in which the collision occurred this court is of the opinion the evidence shows the accident was caused by the negligence of Johnson in following too closely behind plaintiff's vehicle on the open highway and failing to maintain a proper lookout. That plaintiff himself was maintaining a proper lookout is evidenced by his observance of the left turning vehicle and reducing the speed of his vehicle so that the motorist ahead could complete his intended left turn without incident. Plaintiff's vehicle did not strike or come into contact with the automobile that was in the process of turning left. If plaintiff's speed and distance behind the left *854 turning vehicle was such that plaintiff could avoid contact with this vehicle there appears no valid reason why Johnson did not do the same with respect to plaintiff's automobile. Had Johnson not been following so closely behind plaintiff and had he duly observed the movement of plaintiff's automobile he would have realized plaintiff was in the act of reducing his speed or stopping and that to avoid running into the rear of plaintiff's car he must do likewise. It is evident Johnson did not make this observation in time to avoid a collision and his failure in this regard was the sole proximate cause of the accident. It follows, therefore, that there is liability on the part of Johnson's insurer Traders.
"In order to hold Johnson's employer L.S.U. and the employer's insurer Pennsylvania, plaintiff maintains Johnson was acting within the scope and during the course of his employment by L.S.U. at the time of the accident. On this issue the evidence shows Johnson is employed by L.S.U.'s Agricultural Extension Service in the capacity as Assistant County Agent for Franklin Parish, Louisiana, his residence being in Winnsboro, Louisiana. Johnson was employed by the university but his salary is paid jointly by L.S.U. and the Parish of Franklin. On the day of the accident (a Sunday) Johnson was enroute to L.S.U. at Baton Rouge, Louisiana, to attend a meeting at which he had been ordered to be present which meeting was scheduled for 8:30 A.M. the following Monday morning. Hotel accommodations had been arranged for Johnson on the university campus for the night of December 1, the arrangements having been made by officials of the university. The automobile Johnson was driving at the time of the accident was his own. In traveling from his home to Baton Rouge for the meeting in question Johnson was free to choose whatever mode of transportation suited his convenience. He was paid mileage at the rate of 2*S per mile from his home to Baton Rouge irrespective of whether he traveled by private or public conveyance. In the course of his work Johnson was not required to travel by automobile but whenever he traveled on official business he was compensated at the rate of 2 per mile regardless of the method of transportation he selected. On previous occasions when Johnson made similar trips from his home in Winnsboro to Baton Rouge he was paid mileage for 155 miles computed by measuring the shortest highway route between the two points which itinerary passed through Natchez, Mississippi. For the journey in question he was actually paid mileage for 155 miles of travel. On the day preceding the accident (a Saturday) Johnson left his home in Winnsboro at approximately 3:00 P.M., and drove to Simpson, Louisiana, where he spent the night as guest in the home of his mother-in-law. The next afternoon Johnson left the home of his mother-in-law in Simpson, Louisiana, and proceeded toward Baton Rouge by way of Boyce and Alexandria, Louisiana. The distance from Winnsboro to Baton Rouge is considerably greater via Simpson than by way of Natchez, Mississippi. The accident occurred on U. S. Highway 190 approximately 25 miles west of Johnson's destination, Baton Rouge, Louisiana.
"Johnson's regular work week extends from 8:30 A.M., until 5:00 P.M. each weekday and from 8:30 A.M., to 12:00 noon on Saturday. From noon Saturday until 8:30 A.M., Monday morning he was off duty although he was occasionally required to work on Sunday in connection with parish fairs. He had no work to perform on the Sunday in question and is not required to account to his employer for his use of his time off or his actions or whereabouts during his leisure hours.
"Learned counsel for plaintiff maintains that since Johnson was paid mileage for the trip in question he was acting within the scope and during the course of his employment when he left Simpson for Baton Rouge although counsel concedes the journey from Johnson's home in Winnsboro to Simpson was a deviation from the normal *855 route and therefore this portion of the trip did not place Johnson within the scope of his employment. Distinguished counsel is so confident of his position in this regard that he deemed it unnecessary to support same by citation of authority.
"Esteemed counsel for defendants contend the factual situation presented is merely that of an employee on his way to work and since Johnson was off duty at the time with no work to perform for his employer on the Sunday in question, he was not within the scope of his employment at the time of the accident. Counsel for defendants further contend Johnson did not come within the scope of his employer's business until he reported for the meeting on the L.S.U. campus at 8:30 A.M., on the morning following the accident. Illustrious counsel for defendants have cited several cases holding that as a general rule an employee going to and from his place of employment is not considered to be acting within the scope of his employment. Among the more recent decisions cited by counsel for defendants are Herbert L. Harding v. Nick J. Christiana [La.App.] 103 So. (2d) 301; Alexis Romero v. Lee H. Hogue et al. [La.App.] 77 So. (2d) 74 and Boyce v. Greer, et al. [La.App.] 15 So. (2d) 404.
"The foregoing cases (and other cases cited therein) hold that as a general rule an employee in going to and from his place of employment is not considered as acting within the scope and during the course of his employment to such an extent as to render his employer liable to third persons for his negligent acts unless the trip to or from work is required by the employer to be made in an automobile or where the use of the vehicle may be considered as serving some purpose useful or beneficial to the employer such as enabling the employee to arrive more quickly at the employer's place of business. A careful reading of the cases on the subject matter discloses that there is not, nor can there be, any hard and fast rule acceptable as a criterion in every case. It is elementary that each instance must be decided in the light of the particular circumstances involved.
"The following language appearing in the Hogue case, supra, is deemed pertinent:
"It is well settled that, as a general rule an employee, in going to and from his place of employment, is not considered as acting within the scope of his employment to such an extent as to render his employer liable to third persons for his negligent acts. We considered this question thoroughly in Cado v. Many, (La.App.) 180 So. 185, and reached the conclusion that it is only where the trip to or from work is required by the master to be made in an automobile, or other vehicle furnished, or where the use of the vehicle may be regarded as for the owner's purposes, as where it makes it possible for the employee to arrive more quickly at the place of business, that the master, under those special circumstances, may be liable * * *'
"The principle enunciated in the Hogue case, supra, was reaffirmed in the following language taken from the Harding case, supra:
"Second, generally an employee is not acting within the scope of his employment while going to and from his place of employment. This is true even where the vehicle used for such transportation by the employee is owned and furnished by the employer except where there is some distinguishing and additional fact which causes such travel to benefit or serve the employer or his business. Cado v. Many, supra; Boyce v. Greer, La. App., 1943, 15 So.2d 404'.
"The record establishes beyond doubt that Johnson was neither required, instructed nor ordered to travel from his home to Baton Rouge via automobile. His arrival there by automobile prior to commencement of his work on Monday morning was solely to suit his own convenience and *856 served no purpose connected with or useful or beneficial to his employer. It is undisputed he would have been paid mileage at the rate of 2 per mile for 155 miles regardless of what mode of transportation he chose. The automobile in which he was riding was his own, not the property of his employer. Under such circumstances during the trip from his home to Baton Rouge on the occasion in question Johnson was not acting within the scope of his employment regardless of what route he may have selected. His employment did not commence until he reported for the meeting which he was to attend the day following the accident.
"The case at bar does not, as contended by learned counsel for plaintiff, involve a situation in which an employee who has set about his employer's business has deviated therefrom and is in the process of returning thereto. The journey from Johnson's home in Winnsboro to Baton Rouge was not during the course of or within the scope of Johnson's employment considering it was not ordered or required by his employer to be made by automobile and it did not further the employer's business. Under such circumstances, in electing to drive his own automobile to attend the meeting in question, Johnson was in the same position as that of an ordinary employee reporting to work by means of a method of transportation of his own choice. It is the opinion of this court that mere allowance of mileage by the employer for the trip in question is, in itself, not sufficient to characterize the journey as one within the scope of the employee's course of duty. It follows, therefore, that plaintiff's demand against defendant Pennsylvania must be rejected.
"The record establishes that following the accident both plaintiff and Johnson assisted in directing traffic to prevent other motorists from colliding with the vehicles involved in the collision. Plaintiff maintains that immediately upon getting out of his automobile he was seized with an uncontrollable shaking spell but in this respect his testimony is contradicted by Johnson and a state trooper summoned to investigate the accident; the latter witnesses testifying that they noted no trembling on the part of plaintiff and that plaintiff even held a flare to warn approaching motorists. After remaining at or near the scene of the accident, plaintiff resumed his journey to Baton Rouge, Louisiana, and according to plaintiff, enroute to Baton Rouge he developed intense headache and his tremors became progressively worse. Upon reaching Baton Rouge, plaintiff reported to a hospital where he remained approximately five days.
"Plaintiff contends that while in the hospital he suffered swelling of the suboccipital region (the area below the base of the skull at the rear of the head), tremors, a left facial weakness and numbness in the left arm. After being discharged from the hospital plaintiff returned home and sought other medical advice.
"Shortly following his discharge from the hospital plaintiff attempted to work on several occasions but was unable to continue his employment as a welder because of weakness, dizziness and loss of strength in his left hand and arm. Plaintiff testified that in several instances he was retained on jobs for short periods through the generosity and charity of foremen who `took care of him' by allowing him to do either light work or no work at all.
"Prior to the accident in question plaintiff, a white male, approximately 46 years of age, led a vigorous, active life and without difficulty performed all duties in connection with his trade. He was employed at a basic hourly wage of $3.25 with annual earnings in the $6000.00-$7000.00 bracket. In addition, he operated a chicken farm in which he performed most of the work incident to the raising of several thousand fowls. The evidence also shows that plaintiff has an accident history of some five prior accidents (including three hernias) for which he received compensation. It is also shown that in connection with a hernia operation performed several years prior to the accident in question, plaintiff's right testicle was removed and as a result thereof *857 plaintiff was prematurely deprived of his sex powers.
"Following his discharge from initial hospitalization, plaintiff became extremely nervous and apprehensive. He suffers from severe headaches and has lost considerable strength in his left hand and arm. He is unable to perform strenuous work of any kind and because of dizziness and loss of self-confidence he is unable to perform any welding which requires climbing. In addition he has sustained a loss of equilibrium which causes him to stagger when walking. Whereas, he was formerly an extrovert he has become extremely retiring and reluctant to maintain normal social intercourse. He is presently subject to uncontrollable crying spells and experiences difficulty in talking. He is extremely forgetful and frequently undergoes periods in which he experiences a lapse of memory.
"Counsel for plaintiff contends plaintiff is suffering from either actual brain damage sustained in the accident or from traumatic neurosis, anxiety state (psychological overlay) attributable to the accident, or a combination of both. On the other hand counsel for defendants maintain plaintiff sustained virtually no injury in the accident; that he was recovered from the slight effects of the accident upon his discharge from the hospital and that his present symptoms are due to a stroke which occurred subsequent to and from causes unconnected with the accident in question.
"Plaintiff was first seen in the hospital on the day of the accident by Dr. A. M. McInnis, a general surgeon. Dr. McInnis testified that plaintiff complained of pain in the posterior cervical muscles and ligaments. He stated in effect that plaintiff sustained a mild whiplash injury of the neck. When plaintiff continued to complain of headaches Dr. McInnis called Dr. Joseph M. Edelman, a neurosurgeon, in consultation. Dr. McInnis did not observe swelling of the suboccipital region. He further noted that plaintiff's complaints of facial numbness could not be verified by objective findings. He examined plaintiff again on September 22, 1959, and was unable to find any organic damage whatsoever.
"The next doctor to see plaintiff after the accident was Dr. Joseph M. Edelman, a neurosurgeon, who examined plaintiff in the hospital on December 2, 1957, and on plaintiff's subjective complaint found hypesthesia involving the entire right side of plaintiff's head. The decreased sensation related by plaintiff followed no nerve root distribution and Dr. Edelman finding no objective symptoms whatsoever considered plaintiff's alleged hypesthesia to be questionable. Dr. Edelman observed no swelling of the suboccipital region at this time and does not recall plaintiff complaining of a memory lapse. On September 22,1959, Dr. Edelman again examined plaintiff and while he found symptoms of nervous disorder he could find no evidence of injury to plaintiff's nervous system. Dr. Edelman is of the opinion that plaintiff did not sustain a cerebral thrombosis or brain injury as a result of the accident because having examined plaintiff the day after the accident he found no evidence or symptoms of such injury at that time.
"Dr. W. H. Pierson, a general practitioner and surgeon, who has known plaintiff for approximately five years, testified he examined plaintiff on December 7, 1957, and, predicated upon symptoms narrated by plaintiff, believed plaintiff suffered a brain injury in the accident. He found plaintiff's blood pressure elevated whereas it had been normal on November 18, 1957, on which date Dr. Pierson had examined plaintiff for reasons unrelated to the accident in question. Dr. Pierson noted some facial paralysis and numbness on plaintiff's left side and arm. His testimony is clearly to the effect that his diagnosis is predicated upon plaintiff's account of the accident but that if plaintiff did not receive a blow in the accident plaintiff's brain injury, if any, was due to a cerebral hemorrhage or stroke. He further testified that in his opinion plaintiff's present condition is not caused by psychological overlay.
*858 "Dr. Richard B. Langford, a specialist in internal medicine, testified he saw plaintiff on February 9, 1958, and February 15, 1958, and after complete physical examination found no evidence of injury. He stated that if plaintiff were afflicted with tremors following the accident he would attribute such symptoms to nervous reaction rather than injury. He saw plaintiff on numerous occasions from August 15, 1958, through April 6, 1959, and did not observe any evidence of facial paralysis or speech impediment.
"Dr. Edward E. Jordan, an elderly general practitioner and long time acquaintance of plaintiff, testified in substance that plaintiff consulted him following the accident complaining chiefly of aching neck and shoulder muscles. Prior to the accident this witness had treated plaintiff for minor illnesses only. According to Dr. Jordan plaintiff was in good health previous to the accident but subsequent thereto became nervous to the extent Dr. Jordan prescribed sedatives to alleviate plaintiff's symptoms.
"A neurological surgeon, Dr. Frederick C. Boykin, testified he examined plaintiff on February 11, 1958, and February 27, 1959, on each of which occasions he conducted a thorough neurological examination of plaintiff. He first considered plaintiff's condition to be psychosomatic origin and recommended that plaintiff consult a psychiatrist. Dr. Boykin found no organic basis for the symptoms related by plaintiff and is of the opinion that if plaintiff's symptoms are the result of organic brain injury they would be constant instead of recurrent and intermittent as shown by plaintiff's own statements.
"Dr. D. F. Overdyke, Jr., an orthopedic surgeon, examined plaintiff on February 8, and March 22, 1958, upon referral by a Dr. Russell. When Dr. Overdyke first saw plaintiff approximately two months following the accident plaintiff informed him he was then doing light work and being taken care of on the job. Dr. Overdyke recommended that plaintiff continue working. He is of the opinion that the orthopedic difficulty resulting from the accident was of a minor nature and should be considered ended. On direct examination by counsel for plaintiff he testified it is possible the accident may have been the cause of plaintiff's trouble but that he could not say positively that it did or did not. On cross-examination he conceded that because of plaintiff's recital of the details of an extreme nightmare plaintiff experienced on January 27,1958, he concluded plaintiff probably had a stroke on that date.
"Dr. A. J. Mullen, a psychiatrist, examined plaintiff on May 12, 1959, at the suggestion of Dr. Langford. On direct examination Dr. Mullen stated the results of his examination indicate plaintiff may have a functional overlay due to the accident which may have set off a chain reaction although he admitted such after effects are not general or common. However, on crossexamination Dr. Mullen testified he considered plaintiff's condition as depressive reaction not due to functional overlay. He found plaintiff free of psychosis and in effect classified plaintiff's condition as neurotic.
"Dr. Henry K. Faludi, a neurological surgeon, testified that certain tests indicated plaintiff showed cerebral atrophy with some slight indication of the presence of a blood clot that may have been caused by the accident. Predicated upon the history given him by plaintiff, he is of the opinion plaintiff has a right cerebral involvement, possibly a cerebral contusion or laceration. In substance he testified while on cross examination that his diagnosis of cerebral involvement is based on plaintiff's statements to the effect that plaintiff developed a numbness in his left arm enroute to the hospital after the accident and experienced facial paralysis and drooling during his initial hospitalization.
"It is a fundamental rule of evidence that plaintiff bears the burden of proof in a tort action. It is well settled that plaintiff *859 must prove his case by a fair preponderance of the evidence else he cannot prevail.
"Considering the evidence both medical and lay, this court is of the opinion plaintiff has failed to discharge the burden incumbent upon him of proving the injuries of which he complains were caused by the accident of December 1, 1957.
"The preponderance of the medical evidence is clearly to the effect that plaintiff's injuries resulting from the accident amounted to nothing more than mild cervical sprain. It will be recalled that plaintiff's own testimony shows the impact was slight and that he received absolutely no blow to his head. The preponderance of the medical testimony indicates that the accident was not the cause of the cerebral atrophy found by Dr. Faludi and even the evidence of Dr. Faludi himself shows his diagnosis is based on symptoms related by plaintiff and contradicted by Drs. McInnis and Edelman. According to the clear weight of the medical evidence all symptoms attributable to the accident should long since have disappeared. In the opinion of this court the evidence preponderates in favor of the conclusion that plaintiff suffered a cerebral hemorrhage or stroke which occurred subsequent to the accident and entirely from natural causes.
"During the period of his hospitalization immediately following the accident, the records show that plaintiff was suffering from shock, headaches and some pain and discomfort resulting from the whiplash injury to his neck and shoulder muscles. The assessment of quantum for personal injuries is difficult enough in the average or ordinary case and is rendered even more complicated in the case at bar for the simple reason it is impossible to determine the exact date plaintiff suffered the stroke which he undoubtedly experienced following the accident and which this court believes to be the cause of plaintiff's protracted illness. This court is of the opinion the lingering effects of the accident commingled with the symptoms produced by the stroke but had plaintiff not suffered the stroke the effects of the accident would long since have terminated. The record shows the injury attributable to the accident was not particularly severe and considering the evidence in its entirety it is believed an award of $1250.00 will amply compensate plaintiff for the injuries resulting from the incident involved in this litigation.
"In addition plaintiff is entitled to judgment in the total sum of Two Hundred Sixty-Four and 23/100 ($264.23) Dollars, representing expenses incurred in connection with his hospitalization in Baton Rouge and damage to his automobile itemized as follows: Dr. A. K. McInnis $35.00; Dr. Joseph M. Edelman $15.00; Dr. T. P. Raggio $25.00; Our Lady of the Lake Hospital $121.50 and repairs to his automobile in the sum of $67.73.
"For the reasons hereinabove assigned:
"It Is Ordered, Adjudged And Decreed that there be judgment herein in favor of plaintiff Thurman O'Brien and against defendant Traders And General Insurance Company in the full sum of One Thousand Five Hundred And Fourteen and 23/100 ($1,514.23) Dollars, together with legal interest thereon at the rate of five per cent (5%) per annum from date of judicial demand, until paid, and for all costs of this proceeding.
"It Is Further Ordered, Adjudged And Decreed that there be judgment herein in favor of defendants Louisiana State University And Agricultural And Mechanical College and The Insurance Company Of The State Of Pennsylvania and against plaintiff Thurman O'Brien, dismissing said plaintiff's demand against said defendants at plaintiff's cost.
"It Is Further Ordered, Adjudged And Decreed that the fees of the medical experts who testified herein, namely, Doctors A. K. McInnis, Joseph M. Edelman, W. H. Pierson, Richard B. Langford, Edward E. Jordan, Frederick C. Boykin, D. F. Overdyke, Jr., A. J. Mullen and Heinz H. Faludi, *860 be and the same are hereby fixed at the sum of Forty & 00/100 ($40.00) Dollars, each.
"Judgment Read, Rendered and signed in New Roads, Pointe Coupee Parish, Louisiana, in open court this 5th day of February, 1960.
 "s/ Paul B. Landry, Jr.
 "Judge, Division B"
We are in accord with, and adopt as our own, the opinion of the Trial Judge with the exception of his conclusion that Johnson at the time of the accident was not within the scope of his employment and consequently that Pennsylvania, the employer's insurer, was not responsible in judgment for his accident.
It may well be said that "Confusion now hath made his masterpiece" when one examines the judicial pronouncements of the courts of this State and of our sister states on the question of whether or not an employee is within the scope of his employment when an accident occurs making his master responsible.
In 2 Am Jur., page 270, § 347, we find:
"Basis of Liability.The rule holding the principal bound by and liable for the acts and contracts of his agent is founded upon the maxims of the common law,'respondeat superior,' usually used to indicate the tort liability of the principal, or employer, and `qui facit per alium, facit per se,' usually used to indicate the legal identity of the principal and his agent. Both of the maxims are founded upon the principal that a duty rests upon every man, in the management of his own affairs, whether by himself or by his agents or servants, so to conduct them as not to injure another, and that if he does not do so, and another is thereby injured, he shall answer for the damage. This principle does not work any injustice to the principal, for it is based upon the policy of protection of the third person and results from the consideration that it is the principal who makes it possible for the agent to inflict the injury. Moreover, the rule is based on the further reason that the principal holds out his agent as competent and fit to be trusted, and thereby in effect warrants his fidelity and good conduct in all matters within the scope of his agency."
In 57 C.J.S. Master and Servant § 575(d) (4), page 338, we find:
"If within the course of his employment a servant is permitted to use the master's vehicle or team to facilitate the performance of necessary errands of his own, he is still an employee while so doing, and the doctrine of respondeat superior applies. Where, however, a servant uses the master's vehicle for the purpose of going to, and returning from, his meals without the master's knowledge or consent, and the contract of employment does not authorize such use, the master is not liable for injuries sustained through the servant's negligent acts in the use of the vehicle."
In 60 C.J.S. Motor Vehicles § 437(c), page 1101, we find:
"Going to and from work or meals. Whether the owner is liable for the negligence or misconduct of his servant in the operation of his car in going to and from work or meals depends on the facts of the particular case. As a general rule the use by the chauffeur of the owner's vehicle for the purpose of going to and from his place of employment is regarded as a use for the purposes of the chauffeur, and the owner is not liable for an injury occasioned while it is being so used, either without his knowledge or consent or with his permission, as, for example, where he is going to or returning from a meal. The owner may, however, be liable where under the circumstances the chauffeur's use of the vehicle may be regarded as also for the owner's purposes, as where it enables the chauffeur to arrive earlier at *861 his work or shortens the time which he is required to have to procure his meals. It has been held that, where a master places at the disposal of his servant an automobile to be used by the servant in going to and from his work, the transportation is beneficial to both, and the relation of master and servant continues while the automobile is used for such purpose, and that an employee returning from work with the consent and by the authority of his employer in a vehicle owned by the employer is acting within the scope of his employment. The fact that the master contracts to supply a vehicle or that the supplying of a means of access to the work is one of the inducements to the employment indicates that the operation of the vehicle is part of the master's work. If the employee is required to use the vehicle, and particularly if he is paid while using it, he is acting as the owner's servant in operating it. The owner may be liable for his servant's negligence or misconduct where his instructions as to the care of the vehicle are of such nature and certainty and constitute such important and essential duties as to render the servant about the master's business even when driving to and from work."
In 60 A.L.R., page 1159, we find the case of Khoury v. Edison Electric Illuminating Company, a decision of the Supreme Court of Massachusetts, 265 Mass. 236, 164 N.E. 77, holding:
"An employer whose sole interest is that an employee shall be at places where work is to be performed, who leaves the means of transportation to the employee's decision and convenience, limiting his own liability for expense, if the employee uses his own car, to an amount equivalent to the fares of a common carrier, and who assumes no obligation to keep such car in repair, such duty resting upon the employee himself, is not liable as master under the principle of respondeat superior for injuries to a third person which result from the negligence of the servant in operating the car for a purpose in connection with his employment."
In the annotations to this case at page 1163 of the same volume, we find the comment:
"* * * The employer in the Khoury Case was held not liable under the doctrine of respondeat superior for the negligent operation by the employee of the latter's own car which he was using in the course of, and prosecution of, the employer's business at the time of the accident, where the employer's sole interest was that the employee should be at places where work was to be performed, the employer leaving the means of transportation to the employee's decision and convenience, limiting its own liability for expense, if the employee used his own car, to an amount equivalent to the fares of a common carrier, and assuming no obligation to keep the car in repair, such duty resting upon the employee himself."
The annotator refers to the case of May v. Farrell, 94 Cal.App. 703, 271 P. 789, which held the fact that a salesman furnished his own transportation was held not to affect his status as an employee. And in Woodward-Wanger Co. v. Nelson, Tex. Civ.App., 11 S.W.2d 371, a traveling salesman, selling goods by catalog and sample on commission, whose movements, route, and the customers on whom he called were matters of his own concern, and not subject to the control or supervision of the company by which he was engaged, and who used his own automobile in the pursuit of his business of selling for the company, was held to be an employee, and not an independent contractor. In Aldrich v. Tyler Grocery Co., 206 Ala. 138, 89 So. 289, 17 A.L.R. 617, the court held that a salesman employed on a commission basis, who owned and operated an automobile to assist him in seeking his trade, and whose *862 movements were in no way controlled by his employer, was, with respect to the operation of the car, an independent contractor, and the employer was not liable for injuries resulting from the salesman's negligent operation of the car.
The doctrine of respondeat superior is codified in this State, being found in LSA-C.C. Art. 2320 providing:
"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."
* * * * * *
In Marquez v. LeBlanc et al., La.App., 143 So. 108, 112, the Court said:
"The authorities on the question involved are far from uniform and clear, and have been decided in a number of instances by a divided court. The main reason for a lack of satisfactory consistency in the jurisprudence on this subject comes from the fact that in compensation cases the courts have adopted a liberal construction in favor of the claimant where the defense was that the relation of employer and employee did not exist between the parties due to the fact that the claimant was working for an independent contractor. But in actions ex delicto for personal injuries and damages the courts apparently have adopted a strict interpretation and construction of the rule of respondeat superior. This situation is apparent from a reading of several compensation cases, including James v. Hillyer-Deutsch-Edwards, 15 La.App. 71, 130 So. 257; Burt v. Davis-Wood Lumber Co., 157 La. Ill, 102 So. 87; Helton v. Tall Timber Lumber Co., 148 La. 180, 86 So. 729; Bell v. Albert Hanson Lumber Co., Ltd., 151 La. 824, 92 So. 350; Dick v. Gravel Logging Co., Inc., 152 La. 993, 95 So. 99; and Odom v. Lutcher & Moore Lumber Co., 7 La.App. 458.
"In contrast to these decisions we have the opinions in certain damage suits, examples of which are Moffet v. Koch, 106 La. 371, 375, 31 So. 40; Robideaux v. Hebert et al., 118 La. [1089], 1090, 1095, 43 So. 887, 12 L.R.A. (N.S.) 632; Abate et al. v. Hirdes et al., 9 La.App. 688, 121 So. 775; Shea v. Reems, 36 La.Ann. 966.
"Under these circumstances we feel that we are compelled to follow the decisions with reference to the damage suits, rather than the compensation cases."
Under the plain provisions of Civil Code Article 2320, quoted supra, there does not appear to us to be any rationalization for the differentiation between acts committed by the employee involving the workmen's compensation act and acts ex delicto. The sole question to be determined being whether at the time of the accident the employee was engaged in the exercise of functions for which he was employed.
In the case of Hardware Mutual Casualty Company v. Standard Coffee Company, Inc., La.App., 2 So.2d 89, the syllabus prepared by the editors, states:
"An employer was not liable under `respondeat superior' doctrine for damages to automobile with which employee collided while driving employee's own automobile to meet employer's salesman over whose route employee and salesman would drive in employer's truck notwithstanding that employee was paid workmen's compensation for injuries sustained in collision where employer had no control over means by which employee went to meet salesman and employee's use of automobile was not indispensable in conduct of employer's business."
In the concluding paragraph, the Court said:
"There is absolutely nothing in the record which would justify us in saying *863 that the Standard Coffee Company had any control over the means by which Payne got from place to place, and there being no necessary implication from the facts developed, which would suggest the use of the automobile was indispensable in the conduct of defendant's business, we conclude that the doctrine of respondeat superior does not apply, consequently, and for the reasons assigned the judgment appealed from is affirmed."
In the case of Gallaher v. Ricketts et al., La.App., 191 So. 713, the Court held that the employer was not liable for injuries to a third person caused by a newspaper carrier's negligent operation of his automobile while on his way to attend a "pep" meeting being held at his employer's place of business, although an allowance was made by the employer for expenses in operating the car in the delivery of papers. At page 715, the Court said:
"It is well settled that, as a general rule, an employee, in going to and from his place of employment, is not considered as acting within the scope of his employment to such an extent as to render his employer liable to third persons for his negligent acts. We considered this question thoroughly in Cado et al. v. Many [La.App.], 180 So. 185, and reached the conclusion that it is only where the trip to or from work is required by the master to be made in an automobile, or other vehicle furnished, or where the use of the vehicle may be regarded as for the owner's purposes, as where it makes it possible for the employee to arrive more quickly at the place of business, that the master, under those special circumstances, may be liable. The rule is stated, also, in Berry's Law of Automobiles, 7th Edition, Vol. IV, page 649, in Corpus Juris, Vol. 42, Sec. 868, page 1108, and in 5 Blashfield's Cyclopedia of Automobile Law & Practice, Permanent Edition, § 3042."
In McAllister v. Jackson Brewing Company, La.App., 6 So.2d 179, the employee, a salesman, who had been ordered to come from Monroe to New Orleans to attend a sales and advertising meeting by the employer was held acting within the scope of his employment when an accident occurred while on his way to said meeting, on a factual showing that the employer paid him a fixed salary and in addition reimbursed him for his expenses incurred in the maintenance and operation of the automobile owned by the employee and used in the performance of his duties. In the McAllister case the Court made distinction in its holding and in the holding of the Court in the Hardware Mutual Casualty Co. v. Standard Coffee Company, supra, case by saying at page 185 of 6 So.2d:
"Again, we find the facts in the cited case clearly distinguishable from the facts here presented. In the cited case the employee was not `required to use an automobile in order to facilitate the business of his employer'. Here, as already stated, the employee, Schully, was required to use his car in the performance of his duties, as a result of which the accident occurred."
In the case of Embry et ux. v. Reserve Natural Gas Company of Louisiana, 12 La. App. 97, 124 So. 572, at page 575, the Court said:
"We are of the opinion that at the time of the accident the driver of the truck was acting in the scope of his employment. His day's work had already begun by his supplying the motor of the truck with water and oil and gas and taking the truck out of its storage garage and receiving instructions from his employer what the day's work was to be. The fact that, before going to the Lee Hardware Company's warehouse to get the load of dynamite that he was instructed to go there and get and carry to Cotton Valley, he decided to go to his home and get his breakfast, and was on his way there to do so, *864 and concluded to deviate therefrom to the extent of taking the negro woman, Leola Bryant, from where he found her to her place of work, before going to his home, does not, we think, alter the fact that he was in the scope of his duty to his employer. Duffy v. Hickey, 151 La. 274, 91 So. 733; Glass v. Wise & McAlpin, 155 La. 477, 99 So. 409."
In the case of Romero v. Hogue, La. App., 77 So.2d 74, we said at page 80 in commenting upon the Hardware Mutual Casualty Company and the McAllister cases, supra:
"In Hardware Mutual Casualty Co. v. Standard Coffee Co., La.App., 2 So. 2d 89, the employer was not held liable as it had no control over the means by which the employee traveled from place to place, and it was not shown that the use of the automobile was indispensable in the conduct of the employer's business.
"McAllister v. Jackson Brewing Co., La.App., 6 So.2d 179, held an employer liable upon the basis that the employee was required to use his own car in Company business and that the accident occurred while he was on his way to a sales meeting which he had been ordered to attend. Therein, the Standard Coffee Co. case was distinguished, and the doctrine of respondeat superior applied since the employer exercised control over the means of transportation, coupled with the fact that the employee had been ordered to attend the meeting."
In Futch v. W. Horace Williams Co. et al., La.App., 26 So.2d 776, where an employee had been given the right to use a pickup truck in going to and from work and was in an accident, though the Court held a presumption arose that he was acting within the course of his employment, the defendant had rebutted this presumption in proving that the accident occurred more than thirty-six hours after he had left his employment, and despite the fact at the time of the accident he was on his way home, this was not a factual showing that he was on his way home from work at that time. Though for any accident which might have occurred in the thirty-six hour period when the employee was certainly not within the scope of his employment, we can see no real rational distinction here if at the time of the accident the employee was in fact on his way home as, under his contract of employment, the employer was responsible for his actions when on such mission.
While we are in accord with the general rule that in going to and from one's place of employment the employee is not engaged on a mission for his employer, where, as a fact, the evidence reveals that the employee is being compensated by his employer for the mileage and at the time of the occurrence of the accident the employee is on a mission contemplated by employer and employee for which he is to be compensated, it appears to us that these circumstances make logical the holding that at such time the employee is within the scope of his employment. What better evidence is there that the employee is on a mission for his employer or is within the scope of his employment than the fact that the employer is compensating him for his services at that time? Conversely, where an employee is not compensated for his time or is not supplied with a vehicle by his employer to go to and from work, it is clear that at that time the employee is not engaged on a mission for his master but is, so to speak, on his own. The fact that the master has control over the vehicle in our opinion in no way serves to determine the question as to whether or not the employee at the time of the accident is engaged in the service of the master. In those instances where specific methods of transportation are ordered and the employee sees fit to violate the instructions and use other means of transportation, he has disobeyed or abandoned his instructions and is not engaged in the service of his master if an accident occurs at that time. Where, however, without instructions as to his method of transportation the employee obtains *865 such transportation as is reasonable; is being compensated therefor on a mileage basis, and at the time of the accident is in furtherance of the master's duty, we believe the master to be responsible. Factually, in the present case the employee was being compensated by his employer on the mileage basis and at the time of the accident was within twenty-five miles of the location of the meeting in Baton Rouge on a direct route, despite the fact that he had previously diverted from the shortest route from his home to Baton Rouge, we believe that at the time of the occurrence of this accident he was engaged in his employer's business and was within the scope of its authority.
Consequently, and for these reasons, the judgment of the Trial Court is affirmed as to Traders and General Insurance Company and reversed as to The Insurance Company of the State of Pennsylvania, so as to render judgment in favor of plaintiff, Thurman O'Brien, and against defendants, Traders and General Insurance Company and The Insurance Company of the State of Pennsylvania, jointly and in solido, in the sum of one thousand, five hundred and fourteen and 23/100 ($1,514.23) Dollars, with legal interest thereon at the rate of 5% per annum from date of judicial demand until paid and for all costs of these proceedings including the cost of the medical experts.
Affirmed in part, reversed in part and rendered.

On Application for Rehearing
PER CURIAM.
Offered in evidence was the policy of insurance issued by The Traders and General Insurance Company affording public liability insurance on the personal vehicle owned and being driven by Austin W. Johnson at the time of the accident and the policy of insurance issued by The Insurance Company of the State of Pennsylvania to Louisiana State University providing extended coverage to non-owned vehicles. As the amount of the judgment rendered herein in favor of Plaintiff is within the limits of liability of the policy of The Traders and General Insurance Company, which company was the primary insurer, and as the policy issued by The Insurance Company of the State of Pennsylvania providing extended coverage limited its liability as to "nonowned automobile shall be in excess insurance over any other valid and collectible insurance, * * *" The Traders and General Insurance Company is liable for the full amount of this judgment and The Insurance Company of the State of Pennsylvania is liable to the extent only that Plaintiff is unable to collect from The Traders and General Insurance Company the amount of the judgment.
The judgment of this Court handed down on December 27, 1961 is amended so as to read as follows:
The judgment of the Trial Court is affirmed as to The Traders and General Insurance Company and reversed as to The Insurance Company of the State of Pennsylvania, so as to render judgment in favor of plaintiff Thurman O'Brien and against defendant The Traders and General Insurance Company, the primary insurer, in the sum of $1,514.23 with legal interest thereon at the rate of 5% per annum from date of judicial demand until paid and for all costs of these proceedings including the cost of the medical experts.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Thurman O'Brien, and against The Insurance Company of the State of Pennsylvania for the full amount of such judgment rendered in his favor against The Traders and General Insurance Company Plaintiff is unable to collect from said The Traders and General Insurance Company.
In all other respects the Applications for Rehearing are denied.
Affirmed in part, reversed in part and rendered.